Sanford R. DAWSON, Appellant,

v.

Weaver W. SCHERFF, Doing Business as Scherff Truck Lines, Respondent.

No. 44229.

Supreme Court of Missouri.

Division No. 1.

July 11, 1955.

Rehearing Denied Sept. 12, 1955.

Curtis Quimby, Jefferson City, and R. J. Horsefield and Douglas H. Jones, St. Louis, for appellant Sanford R. Dawson.

Wilbur C. Schwartz and Roberts P. Elam, St. Louis, for (defendant) respondent, Joseph Nessenfeld, St. Louis, of counsel.

HOLLINGSWORTH, Judge.

This case came to the writer on reassignment.

Plaintiff had verdict and judgment for $40,000 for personal injuries sustained when an automobile driven westward by him collided with a bridge abutment as he overtook and attempted to pass defendant's westbound truck. Defendant's motion to set aside the verdict and for judgment in accordance with his motion for directed verdict filed at the close of the evidence or, in the alternative, for a new trial, was sustained. The verdict and judgment were set aside, judgment was rendered for defendant and, in the alternative, defendant was granted a new trial on grounds the verdict was against the weight of the evidence and based upon false or mistaken testimony, and for error in the refusal of one of defendant's requested instructions. Plain-

tiff appealed. The questions thus posed are whether, under the evidence, a submissible case was made and, if so, whether the trial court erred in granting a new trial.

The casualty occurred between 12:00 noon and 12:30 p. m., November 16, 1951, on U. S. Highway No. 50, about 15 miles east of Jefferson City. Plaintiff, a representative of National Distillers Products Corporation, travelling alone in his 1948 Cadillac automobile, was en route from his home in Kirkwood to Jefferson City to attend a sales meeting. At the same time a one and one-half ton motor truck of defendant, a licensed carrier of freight, was being driven westward on said highway by defendant's agent, Wilbur Herndon, with a cargo of freight for local deliveries along its route, including three cases of whiskey for delivery to Mead's Cafe, situate immediately west of the point of the collision and on the south side of the highway. Riding in the rear end of the truck and facing eastward was a young man, named Robert Duncan, 17 years of age, employed as a helper to Herndon in unloading freight.

Highway 50, of concrete construction, 20 feet in width, extends in a general east-west direction and crosses a 67-foot bridge over Loose Creek. It was the southeast abutment of this bridge with which plaintiff's car came in contact. Beginning about a quarter of a mile east of the bridge, the highway slopes in a slight curve to within a distance of 152 feet of the east end of the bridge where it straightens, crosses the bridge and extends on westward in a straight level course for more than one-half mile. The slight curve in and slope of the highway east of the bridge did not obscure the vision of the driver of either vehicle or have any bearing upon the facts in controversy. Visibility was good, the pavement dry.

Plaintiff testified on direct examination: When he was 1,200 feet east of the bridge, he saw two westbound passenger cars ahead of him, travelling closely together at a speed of 30 to 35 miles per hour. He increased his speed to 40–45 miles per hour

and passed them when they were 600 or 700 feet from the bridge. As he passed these cars he was aware of defendant's truck also proceeding westward approximately 200 or 300 feet ahead of the cars. After passing the two cars, he turned his car back into the westbound (north) lane and then saw that defendant's truck was not going as fast as he had thought. It was moving about 30 miles per hour. Plaintiff sounded his horn, slightly increased his speed, and turned his car into the left (south) lane to pass the truck. When he was approximately 300 feet east of the bridge and the front wheels of his car were approximately even with the rear wheels of defendant's truck, defendant's truck came over slightly into the left lane. Plaintiff again sounded his horn and touched his brake lightly, thinking the truck would return to its proper lane. By that time, plaintiff's car and defendant's truck were within 80 or 100 feet from the east end of the bridge. At this point, the truck, without any warning, came all the way over into the south lane. Plaintiff either had to go into a deep ravine to his left, hit the truck or strike the left abutment of the bridge, because "he (defendant's operator) come directly in front of me when we were within a few feet of the bridge abutment."

When defendant's truck turned all the way over into the south lane, plaintiff had decreased his speed to 25 or 30 miles per hour and the truck had increased its speed. During this time the left wheels of plaintiff's car had gotten onto the south shoulder of the highway. Plaintiff had "to cut my wheel with everything I had to get out of his way, and apply my brakes." The sharp application of his brakes when the two left wheels of his car were on the grassy-gravel shoulder caused plaintiff's car to skid. The right front wheel of his car struck the abutment, resulting in serious injuries to plaintiff. He was not, however, rendered unconscious. His car was badly damaged and was later sold for $200.

There was no contact between the truck and plaintiff's car. Although plaintiff sounded his horn when he first turned out to pass the truck, sounded it again when

he first applied his brakes lightly and "blew the devil out" of it just before the collision, no portion of the truck ever returned to its right side of the highway. There was no traffic in front of or coming toward the truck and plaintiff from the west.

After his car struck the abutment, plaintiff watched the truck go across the bridge and turn to the left off the highway to Mead's Cafe, which is about 38 feet south of the highway and 250 to 300 feet west of the bridge. Plaintiff called out for some one to get the name of the operator and license number of the truck and, before he was removed to the hospital, a heavy cardboard bearing the truck's license number was thrown into his car.

On cross-examination, plaintiff testified: He saw no reason to turn back into his lane when the truck first veered slightly over the center line. There was no indication it was about to turn to its left and there was no emergency. His car ran alongside the truck for a split second— possibly, 50 feet. When the car and truck were 200 feet from the bridge, the truck was one foot, more or less, across the center line. The truck may have increased its speed when it was 30 feet from the bridge, but he was not sure it did. Plaintiff said he had succeeded in reducing the speed of his car to 20 to 30 miles per hour before striking the abutment; later, he estimated his speed at that point at 15 to 20 miles per hour. Plaintiff admitted that on the day before (during the instant trial) he testified the truck was only part of the way (two-thirds) over the center line when it reached the abutment and that he had testified at a prior trial that when the truck reached the bridge it was all the way over; and that he had so testified in a deposition. Plaintiff never at any time during the 1,200 feet of travel exceeded 50 miles per hour. When his car wheels were even with the truck's rear wheels, plaintiff's speed was about 40 miles per hour, defendant's speed 30 miles. Plaintiff admitted that in a deposition he had testified that the front end of his car was approximately "abreast" of the truck when it began to crowd over

into the left lane, meaning that the front wheels of his car and the front wheels of the truck were approximately even, and that during the instant trial he had said that his front wheels were even with the rear wheels of the truck at that time. His explanation of this discrepancy was: " * * If I might answer you: Your questions were very clear, but at that time I was somewhat confused because it wasn't too long after I had been out of the hospital and out of the house. I didn't know that I could make a change right then and there. You continued to repeat that question to me all through the deposition. I wanted to change it, but I hesitated to, because I didn't know I could after I made the statement. I was later told I could make the change."

Plaintiff admitted that in a deposition he had testified that when he was attempting to pass the truck and was within "possibly 30 feet of the bridge (instead of 80–100 feet as he testified in the instant trial), he (the truck driver) cut directly in front of all of it, over to my lane and remained there until he had crossed the bridge * *." Plaintiff's explanation of this discrepancy was that footage was a hard thing to estimate and that the aforesaid distance could have been 30 feet or it could have been 100 feet.

Defendant's evidence was: The truck operator's (Herndon's) first stop on the trip was to be at Mead's Cafe. As he approached the bridge over Loose Creek, he was travelling 25–30 miles per hour. When he neared the bridge, he put out his hand as a slow signal, intending to slow his vehicle, looked into his rear view mirror and saw two cars to his rear. One of the cars had started to pass him but returned to its lane after he gave the slow signal. When his truck had passed 100 feet west of the bridge, Herndon heard the squeal of brakes, looked into his rear view mirror and saw defendant's car hit the abutment. This was the first instant he had seen plaintiff's car. He drove on down and across the highway to Mead's Cafe, stopped his truck and returned to the scene of the

collision. There were skid marks extending from the rear of plaintiff's car a distance of 84 feet to the center line of the highway. The truck never at any time crossed over the center line of or encroached upon the left side of the highway until it had crossed over the bridge. He never gave any signal that he was going to make a left turn, but gave only the "slow" signal. The helper, Robert Duncan, said defendant's car came down the hill at "seventy-five or eighty" miles an hour, passed two cars, and skidded into the bridge.

Plaintiff's case is predicated upon § 304.-020(5) RSMo 1949, V.A.M.S., which provided:

"An operator or driver of a vehicle overtaking another vehicle going in the same direction and desiring to pass the same shall pass to the left of the vehicle so overtaken; provided, that the way ahead is clear of approaching traffic, but if the way is not clear he shall not pass unless the width of the roadway is sufficient to allow his vehicle to pass to the right of the center thereof in the direction in which his vehicle is moving; and provided further, that no operator or driver shall pass a vehicle from the rear at the top of a hill or on a curve where the view ahead is in any way obscured or while the vehicle is crossing an intersecting highway. An operator or driver overtaking and desiring to pass a vehicle shall sound his signaling device and the operator or driver of the vehicle so overtaken shall promptly, upon such signal, turn his vehicle as far as reasonably possible to the right in order to allow free passage on the left of his vehicle. * * * "

Section 304.020(5), supra, was repealed by Laws 1953, Page 587. See new § 304.016, V.A.M.S., relating to same subject matter.

Defendant contends that plaintiff's evidence, taken as a whole, is so contrary to physical facts as to be of no probative value; that his testimony concerning the movements, positions, and speeds of the vehicles, and his narration of what he claims to have occurred is so contradictory, conflicting, inconsistent and speculative as to deprive it of probative force; and that his evidence, if it may be credited, convicts him of contributory negligence as a matter of law, precluding a recovery.

Defendant says: "The rate of speed necessary for plaintiff to catch up with defendant's truck, the distance from the bridge at that time, the forcible application of plaintiff's brakes resulting in skid marks 84 feet long on the highway, the violence of plaintiff's collision with a bridge abutment, demolishing his heavy Cadillac automobile, the moderate speed at which defendant's truck was admittedly being operated, the position of the Cadillac after the accident, and the absence of any contact between the two vehicles, demonstrate to all reasonable minds that plaintiff was operating his automobile at an excessively high rate of speed and that it was a physical impossibility for the facts to have been as plaintiff testified they were." In support of this contention defendant cites cases holding that probative value cannot be accorded to testimony which is contrary to physical facts. We have no quarrel with that rule; it is a sound one. But, of course, the testimony complained of must relate to essential facts.

The essential facts for determination by the jury were: Did plaintiff overtake and attempt to pass defendant's truck? Was the way ahead clear of approaching traffic and the roadway of sufficient width to permit his passage to the left of the center thereof? Did plaintiff sound his signalling device? Did defendant's operator, upon signal, promptly turn his vehicle as far as reasonably possible to the right in order to allow plaintiff free passage? If, through negligence, he did not keep his vehicle to the right, did his failure to do so cause plaintiff to drive into the abutment? If, upon consideration of all of the evidence, the jury reasonably could resolve these issues in favor of plaintiff, then the mere fact that some of plaintiff's estimates of speed or of the relative positions of the vehicles at a given point cannot be recon-

ciled with physical facts does not of itself make his case non-submissible.

In support of his contention that plaintiff's testimony is so contradictory as to destroy its probative value, defendant cites the case of Steele v. Kansas City Southern Ry. Co., 265 Mo. 97, 175 S.W. 177, and other cases of similar import. The holding in the Steele case is fairly summarized in the syllabus: "Where, on his first examination, plaintiff testified that, without looking and listening, he stepped from a place of safety onto the tracks of the defendant railroad company and was immediately struck, such testimony constituted a judicial admission and was binding, in the absence of a reasonable explanation of mistake; and plaintiff's contradictory testimony, given on the following day without any explanation of mistake, was not enough to carry the question to the jury on the theory that they were the judges of the credibility of the witnesses."

■ Plaintiff's testimony was at times conflicting as to the speed of each and both vehicles and their relative positions upon the highway at particular points. But we are not referred to any conflict or misstatement which is so at war with any essential element of plaintiff's case as to amount to a judicial admission such as will "put him out of court", as was the situation in the Steele case, supra. Unless the testimony of a party or his witnesses or both is so contradictory as to render it valueless, its probative value and weight is for the jury. Caswell v. St. Louis Public Service Co., Mo.Sup., 262 S.W.2d 40, 45 [2]; Smith v. Siercks, Mo.Sup., 277 S.W.2d 521, 525–526.

■ We hold that plaintiff's testimony, considered in its entirety, was not so patently contrary to physical facts or so contradictory as to deprive it of any probative value as a matter of law. And, unquestionably, his testimony otherwise made a submissible case of defendant's negligence under the provisions of said § 304.020, subject only to the question of his contributory negligence.

Was plaintiff guilty of contributory negligence as a matter of law? Defendant says he was, because of his testimony that after he turned into the left lane to pass the truck approximately 300 feet east of the bridge and the front wheels of his car were even with the rear wheels of the truck, the truck came slightly into the left lane and there remained until it was within 80–100 feet of the bridge, at which time it suddenly came all the way over into the left lane, during which time plaintiff admittedly remained in the left lane instead of returning to the right lane. In support of this contention, defendant cites Devine v. Barton, Mo.App., 22 S.W.2d 877, 879, wherein it is held that "if, after turning out to pass, the driver of the overtaking vehicle finds conditions to be such that he cannot make the passage in safety, he should either stop, or else drop back to his original position in the rear of the other car; * * *"

■ We are not convinced that the conditions were such that plaintiff was chargeable with knowledge as a matter of law that defendant's truck operator, after veering slightly into the left lane, would continue to obstruct his passage in violation of § 304.-020(5), which required the truck operator, upon the sounding of plaintiff's signalling device, promptly to turn back to his right to allow plaintiff free passage. Plaintiff testified when the truck veered over slightly into the left lane, there was no indication that it was turning left and no emergency was apparent. We think the jury reasonably could find that plaintiff was not negligent in continuing in the left lane under the circumstances and in sounding his horn and slightly slowing his speed, in the belief the truck had been permitted to drift to the left and that the driver thereof would return it to its lane and permit plaintiff's passage upon being apprised of plaintiff's desire to pass. The issue of plaintiff's contributory negligence was a question for the jury. The assignment is overruled.

■ In his original brief, plaintiff contends that the trial court was without jurisdiction to enter judgment in favor of defendant and, in the alternative, to grant

him a new trial in the event it be determined on appeal that error was committed in setting aside the verdict and judgment originally entered in behalf of plaintiff. In so contending, plaintiff is clearly in error. In the case of Hughes v. St. Louis National League Baseball Club, 359 Mo. 993, 224 S.W.2d 989, 16 A.L.R.2d 904, this court, en banc, ruled the precise question adversely to plaintiff's contention. See also Johnson v. Kansas City Public Service Co., 358 Mo. 253, 214 S.W.2d 5, 8; Caddell v. Gulf, M. & O. R. Co., Mo.App., 217 S.W.2d 751, 756–759; Stutte v. Brodtrick, Mo.Sup., 259 S.W.2d 820, 826 [12]. Under the authority of those cases, it was the duty of the trial court, after sustaining the motion to set aside the verdict and judgment for plaintiff and rendering judgment for defendant, to rule the motion for new trial in the alternative. In his reply brief, plaintiff concedes the above cited cases announce the rule above stated but urges that the ruling is wrong and that we should reconsider it. For the reasons stated in the cited cases, we remain convinced the rule is sound. The assignment is overruled.

■ Being of the opinion that plaintiff made a submissible case against defendant, we now consider the propriety of the court's alternative ruling sustaining defendant's motion for new trial. The trial court is vested with an inherent and broad discretion in granting one new trial upon the ground the verdict and judgment are against the weight of the evidence. Albert J. Hoppe, Inc., v. St. Louis Public Service Co., Mo.Sup., 235 S.W.2d 347, 349; Cases collected in West's Missouri Digest, New Trial, ☜72; Section 510.330 RSMo 1949, V.A.M.S. And its ruling upon that ground will not be disturbed, except in case of manifest abuse. Dye v. St. Louis-San Francisco Ry. Co., 361 Mo. 331, 234 S.W.

2d 532, 534; Cases collected in West's Missouri Digest, Appeal and Error, ☜979 (2). The rule is sometimes expressed by saying "that the granting of a new trial by the trial court will not be interfered with on appeal where there is substantial evidence to sustain the trial court's view, or, putting it another way, when there is substantial evidence to support a verdict for the party to whom a new trial is granted." Walsh v. Southwestern Bell Tel. Co., 331 Mo. 118, 131, 52 S.W.2d 839, 845. See also C. Bewes, Inc., v. Buster, 341 Mo. 578, 108 S.W.2d 66.

■ There was substantial evidence that defendant's truck did not enter upon the left lane until after it had crossed the bridge and plaintiff's car had crashed into the abutment. Obviously, a finding of that fact would disprove any actionable negligence on the part of defendant and support a verdict in his behalf. It was the province of the trial court to determine the relative weight of the conflicting evidence. Therefore, the trial judge cannot be convicted of an abuse of discretion in granting a new trial upon the ground that the verdict was against the weight of the evidence.

What we have said herein in ruling the submissibility of this case makes it unnecessary and, perhaps, unwise to discuss other contentions of the parties as to whether prejudicial error was committed in refusing and giving certain instructions. The propriety of such instructions can best be determined at the close and upon consideration of the evidence and instructions proffered in any future trial.

The judgment is reversed and the cause remanded.

All concur.